[No. 35650-0-I.   Division One.   July 22, 1996.]

THE STATE OF WASHINGTON, *Respondent*, v. DALE EDWIN EATON, *Appellant*.

*Eric Broman, Jonathan T. Stier,* and *Nielsen & Acosta,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Robert T. Reischling, Deputy,* for respondent.

AGID, J. — Dale Eaton appeals his convictions for first degree rape, second degree robbery and felony harassment contending that we must reverse his convictions because the trial court failed to enter written CrR 3.5 findings of fact and conclusions of law. He also contends the trial court should have merged the felony harassment conviction with the rape conviction for sentencing purposes. Because the findings and conclusions are now part of the record and Eaton was not prejudiced by their delayed entry, they do not provide a basis for reversing his convictions. We further conclude that the trial court properly refused to merge the felony harassment and first degree rape convictions because felony harassment is not a crime the State must prove to elevate rape to a first degree felony. Eaton also challenges the trial court's requirement that as a condition of community placement he enter into and make reasonable progress in a mental health or sexual deviancy treatment program. We disagree with his contention that the trial court lacked statutory authority to order him to make reasonable progress in a treatment program and conclude that, in any event, the issue is not ripe for review. We therefore affirm both the conviction and conditions of community placement.

## FACTS

On June 27, 1994, Eaton left a tavern and got into the front seat of a taxi cab driven by G, an acquaintance of his. G explained the cab company's policy of driving people home from the tavern for a flat fee of $5. Eaton gave her

$5 and directed her to a bank parking lot. Once there, he asked her to make out with him. When she refused, he told her to take him to his house. While she was driving, he grabbed her around the neck and choked her. He told her he was "going to fuck" her and then kill her. Eaton directed G to a driveway in front of a duplex. When she parked the car, Eaton pulled her into the back seat and raped her. Throughout the incident, Eaton choked G and threatened to kill her. He repeated his threat to kill her after he raped her. After the rape, Eaton took the $5 he had given G earlier for cab fare.

By amended information, the State charged Eaton with first degree rape, second degree robbery, felony harassment and first degree kidnapping. The court held a CrR 3.5 hearing to determine the admissibility of statements Eaton made following his arrest. It ruled the statements admissible and stated its reasons on the record. At the time Eaton filed his opening brief, the court had not entered written CrR 3.5 findings and conclusions. The trial court has since done so, and that document is now part of the record.

The jury found Eaton guilty as charged. At sentencing, Eaton argued that his felony harassment and kidnapping charges should both merge into the rape charge. The trial court agreed that the kidnapping charge merged with the rape charge and ordered the kidnapping charge stricken. But it held that the felony harassment charge did not merge with the rape because the two offenses did not have the same elements and the threats that constituted the harassment continued after the rape was completed. The court sentenced Eaton to a standard range sentence of 136 months for the first degree rape, 13 months for the robbery and 5 months for the felony harassment, to be served concurrently. It also imposed 24 months of community placement and ordered Eaton to "enter into and make reasonable progress in mental health counseling, and/or sexual deviancy therapy, with a therapist approved by"

his community corrections officer within 30 days of his release from confinement. Eaton appeals.

## DISCUSSION

### I. CrR 3.5 Findings and Conclusions

■ Because the trial court's written CrR 3.5 findings and conclusions are now part of the record, the issue is whether the delay in entering them, rather than their absence, warrants reversal. Absent a showing of prejudice or some indication that they have been tailored to address issues on appeal, the late entry of findings of fact and conclusions of law is not a ground for reversal. *State v. Litts*, 64 Wn. App. 831, 836-37, 827 P.2d 304 (1992). *See also State v. Portomene*, 79 Wn. App. 863, 865, 905 P.2d 1234 (1995) (delayed entry of CrR 6.1(d) findings and conclusions does not require reversal unless the delay prejudiced the defendant or prevented effective appellate review), *review denied*, 129 Wn.2d 1016 (1996). Eaton does not claim the trial court's oral findings and conclusions following the CrR 3.5 hearing were inadequate or that the written findings differ from the oral opinion. Nor has he argued that the delay in entering the written document has prejudiced him. We cannot reverse his conviction on this basis.[1]

### II. Merger

Eaton contends the trial court violated the merger doctrine by imposing multiple sentences for his felony harassment and first degree rape convictions. As a threshold matter, we address the State's contention that the Supreme Court recently abrogated the merger doctrine in *State v. Calle*, 125 Wn.2d 769, 888 P.2d 155 (1995), and

---

[1]We note here, as we did recently in *Portomene*, that although it is the State's obligation to present the trial court with written findings and conclusions when it is the prevailing party, the trial court also bears "some responsibility in ensuring that the record is complete." 79 Wn. App. at 865. We reiterate that we expect all parties and the trial court to work in concert to ensure that findings and conclusions are timely entered.

that a double jeopardy claim is now the only avenue available to challenge multiple punishments arising out of a single criminal episode. Calle received concurrent sentences for first degree incest and second degree rape based on a single act of intercourse with his stepdaughter. He appealed, contending he should have received a single sentence for the two offenses because he committed both by one criminal act. The legal basis for Calle's challenge is not entirely clear from the court's opinion. However, it categorically rejected his argument that "grounds other than double jeopardy prohibit his convictions," and resolved his appeal exclusively on double jeopardy grounds. 125 Wn.2d at 775.

Calle apparently argued that under *State v. Birgen*, 33 Wn. App. 1, 651 P.2d 240 (1982), *review denied*, 98 Wn.2d 1013 (1983), multiple punishments based on the same act could be challenged on grounds other than double jeopardy. The Supreme Court disagreed and rejected the portion of *Birgen* Calle relied on to make this argument. When *Birgen* was decided, Washington followed the concurrent sentence rule. Under that rule, when the State brings several charges against a defendant for the same act or transaction and obtains convictions on all counts, no double jeopardy issue arises if the defendant receives concurrent sentences that do not exceed the penalty for any of the offenses because he is being punished but once for his unlawful act. *Calle*, 125 Wn.2d at 772. Because the defendant in *Birgen* received concurrent sentences for his multiple convictions, the concurrent sentence rule required the court to reject his double jeopardy claim. It nonetheless reversed, concluding that concurrent sentences could be reviewed "for non-double jeopardy reasons." 33 Wn. App. at 5.

In *Calle*, the Supreme Court criticized *Birgen* stating that the court there "did not enumerate its non-double jeopardy reasons nor do we believe any exist." 125 Wn.2d at 775. In the *Calle* court's view, the *Birgen* court "was attempting to reach a double jeopardy analysis despite the

concurrent sentence rule." 125 Wn.2d at 775. The *Calle* court specifically rejected the *Birgen* court's assertion that there are non-double jeopardy reasons for reviewing multiple punishments because "the foundation for such review is the constitutional prohibition against double jeopardy." 125 Wn.2d at 775.

■ From this language in *Calle*, the State extrapolates that the Supreme Court intended to discard the merger doctrine because it is a basis distinct from double jeopardy for challenging multiple punishments arising from the same criminal event. The language in *Calle* is certainly broad and, read literally, would abrogate any grounds other than double jeopardy for challenging multiple punishments, including the merger doctrine. We do not assume, however, that the Supreme Court intended to discard the merger doctrine without addressing the doctrine at all. Where the literal words of an opinion appear to control an issue but the opinion neither addresses nor considers the issue, the opinion is not dispositive and a subsequent court may reexamine the issue without violating stare decisis or usurping the role of a higher court. *ETCO, Inc. v. Department of Labor & Indus.*, 66 Wn. App. 302, 307, 831 P.2d 1133 (1992); *see also Kish v. Insurance Co. of North Am.*, 125 Wn.2d 164, 172, 883 P.2d 308 (1994). *See also State v. McJimpson*, 79 Wn. App. 164, 901 P.2d 354 (1995) (decided after *Calle* and discussing both merger and double jeopardy), *review denied*, 129 Wn.2d 1013 (1996). Unless the Supreme Court specifically holds otherwise, we assume that the merger doctrine survived *Calle* and, accordingly, resolve Eaton's contention on the merits.

■■ The merger doctrine is a judicially created device "designed to prevent an unnatural elevation of the 'true' crime charged." *State v. Slemmer*, 48 Wn. App. 48, 56, 738 P.2d 281 (1987). It is "a doctrine of statutory interpretation used to determine whether the Legislature intended to impose multiple punishments for a single act [that] violates several statutory provisions." 48 Wn. App. at 56

(citing *State v. Vladovic*, 99 Wn.2d 413, 419 n.2, 662 P.2d 853 (1983)). "Unlike double jeopardy, it is not of constitutional magnitude." *Slemmer*, 48 Wn. App. at 56-57. Also unlike double jeopardy, it does not apply to all crimes or punishments. Rather, it

> only applies where the Legislature has clearly indicated that in order to prove a particular degree of crime (*e.g.*, first degree rape) the State must prove not only that a defendant committed that crime (*e.g.*, rape) but that the crime was accompanied by an act [that] is defined as a crime elsewhere in the criminal statutes (*e.g.*, assault or kidnapping).

*Vladovic*, 99 Wn.2d at 420-21.

The merger doctrine, therefore, applies where a crime can be elevated to a higher degree by proof of another crime proscribed elsewhere in the criminal code. First degree rape is such a crime. Second degree rape is elevated to first degree when the rape is accompanied by use or threat to use a deadly weapon, kidnapping, infliction of serious physical injury or felonious entry into a building or car the victim is in. *See* RCW 9A.44.040(1)(a)-(d). Eaton was convicted of first degree rape under RCW 9A.44.040(1)(b), the kidnapping provision of the rape statute. He was also convicted of first degree kidnapping under RCW 9A.40.020(1)(b). Under the merger rule, the trial court properly struck the kidnapping conviction because it is one of the crimes accompanying the act of rape that elevated it to a first degree felony. Felony harassment, on the other hand, is not one of the crimes that elevates rape from a second to a first degree felony. The merger doctrine, therefore, does not apply in this context and the trial court correctly refused to strike Eaton's felony harassment conviction.

Despite this, Eaton contends that felony harassment merges with first degree rape because the definition of "forcible compulsion," one of the elements of rape, describes the same conduct as the felony harassment statute. To establish forcible compulsion by threat, the State

must prove a threat "that places a person in fear of death or physical injury."[2] A person is guilty of harassment under RCW 9A.46.020(1)(a)(i) if, "[w]ithout lawful authority, the person knowingly threatens . . . [t]o cause bodily injury in the future to the person threatened or to any other person." Under RCW 9A.46.020(2)(b), harassment is a class C felony if "the person harasses another person under subsection (1)(a)(i) of this section by threatening to kill the person threatened or any other person." Eaton argues that felony harassment merges with first degree rape because forcible compulsion, like felony harassment, can be established by a threat of death.

■ Eaton is wrong. As noted above, the type of conduct that establishes felony harassment does not elevate rape from second to first degree. On the contrary, forcible compulsion is an element of both first degree rape and one of the alternative means of proving second degree rape. *See* RCW 9A.44.040 (defining first degree rape) and RCW 9A.44.050 (defining second degree rape). As an element that can be shared by first and second degree rape, it is, by definition, not an additional element required to elevate the crime to a higher degree. In *Vladovic* the Supreme Court clearly held that the merger doctrine does not apply in this type of situation. 99 Wn.2d at 421. It applies only where the State must prove both an underlying crime and an accompanying crime to prove a particular degree of crime. Felony harassment does not meet that requirement, and the merger doctrine does not apply.

■ Even if we agreed with Eaton that the merger doctrine applied, we would nonetheless reject his argument. The trial court explicitly found that the first degree rape and the felony harassment were distinct criminal acts because Eaton continued to threaten to kill G even after

---

[2]*See* RCW 9A.44.010(6) (defining forcible compulsion as "physical force which overcomes resistance, or a threat, express or implied, that places a person in fear of death or physical injury to herself or himself or another person, or in fear that she or he or another person will be kidnapped").

he completed the rape. It therefore refused to merge the harassment with the rape on a factual basis.

## III. Community Placement Condition

The court sentenced Eaton on November 11, 1994, under the 1990 version of RCW 9.94A.120(8). The Legislature amended the statute in 1995 and renumbered several sections of the statute. The provision we discuss here, former RCW 9.94A.120(8) is now codified at RCW 9.94A.120(9). Former RCW 9.94A.120(8)(c)(iii) authorizes a sentencing court to require offenders convicted of certain crimes to "participate in crime-related treatment or counseling services" as a condition of community placement.[3] The trial court ordered Eaton to enter into and make reasonable progress in counseling or therapy as a condition of his community placement. Eaton challenges this provision on the ground that the trial court lacked authority to require affirmative rehabilitative conduct from him. We disagree because the plain language of the statute grants the trial court authority to do exactly that.

Division Three of this court recently addressed a similar issue in *State v. Holland*, 80 Wn. App. 1, 905 P.2d 920 (1995). Holland challenged the court's statutory authority to require him to take polygraph tests to monitor his compliance with its community placement conditions. The *Holland* court agreed that the sentencing court exceeded its authority and reversed this portion of his sentence. The court noted that, although a trial court may order an offender to comply with crime-related prohibitions as part of community placement under RCW 9.94A.120(8)(c), the definition of a crime-related prohibition explicitly precludes the court from directing "an offender affirmatively

---

[3]The version of RCW 9.94A.120 in effect when Eaton was sentenced provides that a trial court may impose special conditions, including the one at issue here, for "an offense categorized as a sex offense, a serious violent offense, assault in the second degree, any crime against a person where . . . the defendant or an accomplice was armed with a deadly weapon . . . or any felony offense under chapter 69.50 or 69.52 RCW, committed on or after July 1, 1988." RCW 9.94A.120(8)(b), (c).

to participate in rehabilitative programs or to otherwise perform affirmative conduct." *See* RCW 9.94A.030(11); *Holland*, 80 Wn. App. at 3-4. It reasoned that giving answers to questions requires more than passive, uncommitted conduct and that therefore the portion of the sentence ordering Holland to submit to a polygraph examination violated the statute because it directed him to perform affirmative conduct. 80 Wn. App. at 4. *Holland* does not apply in this case because here the court ordered Eaton to participate in crime-related treatment rather than imposing a crime-related prohibition. The trial court's authority to order crime-related treatment is not restricted to requiring non-affirmative conduct.

In our view, furthermore, although the *Holland* court correctly noted that a sentencing court may not require affirmative conduct from an offender under its authority to impose crime-related prohibitions, we question its holding that a court may not require him to submit to a polygraph examination to monitor his compliance with a sentencing condition, regardless of whether the condition is a crime-related prohibition or a requirement that he participate in crime-related treatment. The *Holland* court's approach confuses the ability to effectively monitor an offender's compliance with a sentencing condition with the condition itself. If, for example, following an offender's conviction for a crime like child molestation, a court orders him to stay away from places where children congregate, that is a crime-related prohibition. If the court also orders him to submit to polygraph examinations to monitor his compliance with this prohibition, this portion of the order, although it arguably requires affirmative conduct, is not itself a condition of supervision. Rather, it is a monitoring tool incidental and, perhaps, necessary to a crime-related prohibition. As such, it is more akin to requiring urinalysis testing to monitor compliance with a condition prohibiting drug use in a VUCSA case. In the child molestation scenario described above, short of following an offender around constantly, it is difficult to see how the person charged with monitoring his compliance

with the court's conditions can verify or disprove reports that he has violated the court's order to stay away from areas children frequent without giving him a polygraph examination. We disagree with the *Holland* court's resolution of this issue because it undermines a trial court's ability to ensure an offender's compliance with crime-related prohibitions that cannot be easily monitored.

Eaton further contends that the trial court lacked authority to order him to make "reasonable progress" in treatment. We disagree. Former RCW 9.94A.120(8)(c)(iii) permits a court to order a defendant to "participate" in treatment. That word is not defined, so it must be given its ordinary meaning. *State v. Lira*, 45 Wn. App. 653, 726 P.2d 1015 (1986) (a word in a statute will be given its ordinary meaning unless it is defined in the statute), *review denied*, 107 Wn.2d 1028 (1987). "Participate" means "to take part in something . . . or share in something." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1646 (1969). Commonly understood, the word means something more than merely being present. It connotes an active presence in which one contributes something to a common enterprise.[4] Thus, at a minimum, the trial court may require the defendant to cooperate in the treatment program. If participate does not mean cooperate and do what is required to progress in the program, there is no point in ordering a defendant into treatment at all. Otherwise, he or she could attend but refuse to listen, do assignments or otherwise get any benefit from the program. That would be both anomalous and illogical. We do not think this is what the Legislature had in mind when it authorized trial courts to impose treatment conditions, for certain serious offenses. The requirement that Eaton make reasonable progress in the treatment program is a

---

[4]The distinction our accomplice liability cases make between "mere presence" and actively associating oneself with the criminal enterprise is an instructive analogy. *See, e.g., State v. Galisia*, 63 Wn. App. 833, 839, 822 P.2d 303 ("aiding and abetting requires that one associate oneself with the undertaking, *participate* in it as something one desires to bring about, and seek by one's action to make it succeed") (italics ours) (citing *In re Wilson*, 91 Wn.2d 487, 491, 588 P.2d 1161 (1979))), review denied, 119 Wn.2d 1003 (1992).

fair reading of the statute and does not exceed the trial court's authority to require treatment in the first place.

Furthermore, because the condition has not yet been enforced nor has Eaton suffered any negative consequences from the court's order, the issue is not ripe for review. *See State v. Langland*, 42 Wn. App. 287, 292, 711 P.2d 1039 (1985) (an issue is not ripe unless the person seeking review is harmfully affected by the law or order as applied to him); *see also State v. Phillips*, 65 Wn. App. 239, 244, 828 P.2d 42 (1992) (issue of costs not ripe for review when costs imposed, but only when State attempts to collect them). In *Langland*, the court refused to consider whether a suspended life sentence was constitutionally prohibited cruel punishment if the suspended sentence were revoked and a life sentence imposed because there, as here, the consequences of the court's order were merely potential, not actual. 42 Wn. App. at 292. In a situation similar to the one here, we recently held that a claim is premature unless and until the trial court imposes some sanction for failing to comply with it. *See State v. Massey*, 81 Wn. App. 198, 913 P.2d 424 (1996). Finally, we note that if Eaton is accused of violating the condition, the trial court will schedule a modification hearing and the arguments he makes here can be presented to that court. It can then decide the issue in the context of specific facts that will allow it to determine whether Eaton is in fact "participating" in the treatment program as required by former RCW 9.94A.120(8)(c)(iii).

The convictions and community placement condition are affirmed.[5]

---

[5]We note that in three unpublished opinions a panel of this court concluded that "reasonable progress" conditions exceeded the trial court's authority. However, that panel did not have the benefit of the arguments presented by the parties in this case on which we base our decision. *See State v. Singh*, No. 34356-4-I (Wash. App. Dec. 27, 1995); *State v. Williamson*, No. 35464-7-I (Wash. App. Feb. 20, 1996); and *State v. Brennan*, No. 35655-1-I (Wash. App. Feb. 26, 1996).

COLEMAN and COX, JJ., concur.