# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 49075-7-II |
| Respondent, | |
| v. | |
| LERONE MAJOR, JR., | UNPUBLISHED OPINION |
| Appellant. | |

MELNICK, J. — Lerone Major Jr. appeals his convictions and sentence for assault in violation of a no contact order, violation of a post-conviction no contact order, two counts of assault in the fourth degree, and interfering with the reporting of domestic violence.

We conclude that Major did not receive ineffective assistance of counsel and affirm his convictions. Because the judgment and sentence is unclear as to what the sentencing court intended as to suspended time and community custody, we remand to the trial court to resentence Major.[1]

## FACTS

Major and Jazmine Graves married on March 1, 2015. As of May 11, a domestic violence no contact order prohibited Major from having any contact with Graves. By August 1, Graves had vacated the marital residence. On that date, Graves, seven months pregnant, returned to the marital

---

[1] Major also asks us to waive appellate costs. Pursuant to RAP 14.2, we will defer to a commissioner if the State files a cost bill and Major objects.

residence to retrieve some personal belongings. She found Major there watching television. Graves reported what happened next to a 911 operator and to Officer Joshua Bartz. She provided a different version of events at trial.

I.      GRAVES' ACCOUNT OF EVENTS

The following is Graves's description to a 911 operator and to Bartz on August 1. Both took Graves's statements and recorded them. The jury heard both recordings.

After Graves returned to the marital residence, she went into the bedroom to retrieve her belongings and closed the door. Major confronted Graves about locking him out of the bedroom and demanded she leave the apartment. Graves responded that she came to get her belongings. Major "got in [her] face" and repeated that she shouldn't be there so Graves pushed him away. Report of Proceedings (RP) (May 11, 2016) at 67.

Major became angry and started punching Graves and slapping her face. He knocked off her glasses. When Graves tried to escape, Major pushed her away. Major then took Graves's cell phone and refused to return it, claiming it was his phone.

After a brief scuffle over the phone, Graves convinced Major to look at its back, where he saw a label identifying it as Graves's phone. Major then returned the phone and apologized. Graves went into another room and called 911. Midway through the call, Major took the phone from Graves's hand and threw it against the wall, cutting off the call. He then punched Graves in the face and choked her so that she could not breathe.

The 911 operator called Graves back and Major started to leave. As Graves attempted to lock the door behind Major, he punched her in the face again. He then left the apartment. Graves told both the 911 operator and Bartz that she knew a no contact order existed.

The police contacted Graves and agreed to meet with her at the hospital. While at the hospital, Graves received six calls to her cell phone from the same number. She identified the caller by voice as Major and immediately hung up after the first call. She did not answer the remaining calls.

At trial, Graves told a different version of events. She took more responsibility for the violent encounter, downplayed her injuries, and indicated confusion as to whether there had been a no contact order in place. She stated that, because of a medical condition that occurs when she gets angry, she blacked out through much of the incident. She also testified that she responded to Major's slapping and punching by "swinging back." RP (May 10, 2016) at 31.

Graves explained that the 911 call was cut short because her cell phone battery died, not because Major threw the phone. She testified that she defended herself from Major with a large cooking fork. Graves reiterated that Major punched her numerous times and choked her. She also affirmed that she had received calls from Major when she was at the hospital.

Because Bartz took extensive photographs of Graves's injuries, the jury saw corroboration of Graves's original account. Bartz also testified that Graves's reports of being choked by Major were consistent with his training about strangulation and choking allegations.

II.    MAJOR'S ACCOUNT OF EVENTS

The police stopped Major when he left his apartment at approximately 10:27 P.M. after the incident. Major told Officer Alicia Howard that he had argued with Graves about her phone and that she "went crazy" and started scratching him. RP (May 10, 2016) at 80. He claimed that the only physical contact he had with Graves occurred when he "batted her hands away." RP (May 10, 2016) at 80. Major told Howard that he knew about the no contact order.

Major testified and confirmed that he had had a physical confrontation with Graves. He asserted that Graves had physically attacked him when she tried to retrieve her phone from him. He believed the phone belonged to him. Major admitted he struck Graves when she reached for the phone, but did so accidentally. Major told the jury he used force to stop Graves and "jabbed her neck" causing her to "start gasping." RP (May 11, 2016) at 102. He denied squeezing her throat. Major said any other physical contact resulted as he attempted to block her blows.

III.     MAJOR'S CRIMINAL CHARGES, TRIAL, AND SENTENCING

On August 4, the State charged Major with burglary in the first degree, assault in the second degree with an aggravating factor based on the victim's pregnancy, an assault that violated the no contact order, violation of a post-conviction no contact order, two counts of assault in the fourth degree, and interfering with the reporting of domestic violence.[2] All but the last charge included domestic violence allegations.[3]

Pretrial, the judge granted Major's motion in limine, which forbade "[a]ny reference to the complaining witness as the 'victim.'" Clerk's Papers (CP) at 40; *see also* RP (May 9, 2016) at 9 (trial court granting motion). During the trial, on direct examination, Bartz referred to Graves as "victim Jazmine" three times while he described the photographs of her injuries. RP (May 11, 2016) at 37-39. Major's attorney did not object to any of these statements.

The jury found Major guilty of assault in violation of a no contact order, violation of a post-conviction no contact order, two counts of assault in the fourth degree, and interfering with the reporting of domestic violence. The first charge is a felony; the others are gross misdemeanors.

---

[2] RCW 9A.52.020(1), 9A.36.021(1)(g), 9.94A.535(3)(c), 26.50.110(4), 26.50.110(1), 9A.36.041 9A.36.150.

[3] RCW 10.99.020(5).

Through a special verdict form, it also found that Major and Graves were members of the same family or household. It found Major not guilty of burglary in the first degree and assault in the second degree.

Major received a sentence of nineteen months on the felony and 364 days on each of the gross misdemeanors. The court suspended the sentences on the gross misdemeanors for two years and imposed an additional twelve months of community custody on each count. The trial court used one judgment and sentence for all of the counts. It did not clearly indicate whether it intended the suspended misdemeanor jail time to run concurrently or consecutively to the imposed felony time. Major appeals.

ANALYSIS

I.    INEFFECTIVE ASSISTANCE OF COUNSEL

Major argues that he received ineffective assistance of counsel because his attorney failed to object three times when a witness used the term "victim" in violation of a ruling in limine. We disagree.

A.    STANDARD OF REVIEW

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution guarantee the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011).

We review claims of ineffective assistance of counsel de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). To prevail on a claim of ineffective assistance of counsel, the defendant must show both (1) that defense counsel's representation was deficient, and (2) that the deficient representation prejudiced the defendant. *Grier*, 171 Wn.2d at 32-33. Representation

is deficient if, after considering all the circumstances, the performance falls "'below an objective standard of reasonableness.'" *Grier*, 171 Wn.2d at 33 (quoting *Strickland*, 446 U.S. at 688). Prejudice exists if there is a reasonable probability that, except for counsel's errors, the results of the proceeding would have differed. *Grier*, 171 Wn.2d at 34. If either prong is not satisfied, the defendant's claim fails. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 673, 101 P.3d 1 (2004).

A defendant faces a strong presumption that counsel's representation was effective. *Grier*, 171 Wn.2d at 33. Legitimate trial strategy or tactics cannot serve as the basis for a claim of ineffective assistance of counsel. *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009).

There is "no claim for ineffective assistance of counsel when the challenged action goes to a legitimate trial strategy or tactic." *State v. Kolesnik*, 146 Wn. App. 790, 801, 192 P.3d 937 (2008). Further, the "decision whether to object is a classic example of trial tactics, and only in egregious circumstances will the failure to object constitute ineffective assistance of counsel." *Kolesnik*, 146 Wn. App. at 801.

"Conversely, a criminal defendant can rebut the presumption of reasonable performance by demonstrating that 'there is no conceivable legitimate tactic explaining counsel's performance.'" *Grier*, 171 Wn.2d at 33 (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)). Strategic decisions must be reasonable. *Grier*, 171 Wn.2d at 34.

B.     No Deficient Representation

Major argues that his trial attorney's failure to object when a witness referred to Graves as "victim Jazmine" was not a reasonable trial strategy and constituted deficient representation. We disagree.

6

Major's attorney did object to violations of the trial court's ruling in limine three times over the course of the trial, indicating that his failure to do so with regard to the "victim" label was a calculated decision on his part. One of these objections occurred mere moments after Bartz's reference to Graves as "victim Jazmine" when he began to describe the incident as a "domestic violence situation." RP (May 11, 2016) at 41. Defense counsel's repeated diligent objections throughout the trial further indicate that his failure to object to a particular violation was more likely strategic than deficient.

In an effort to meet his burden to show "egregious circumstances," Major points to the conceded fact that an objection would have been sustained. Thus, Major argues, there could have been no reasonable strategic basis for his trial attorney not to object. However, several strategic explanations exist for the attorney's decision to not object. Some of them follow. The lawyer may not have wanted to bring further attention to the use of the term "victim" by objecting to it. He also may not have wanted to alienate the jury by objecting too frequently. The failure to object had a conceivable strategic basis and did not rise to the "egregious circumstances" required to warrant a reversal. *Kolesnik*, 146 Wn. App. at 801. Major's counsel was not deficient.

C.      OPINION EVIDENCE

Major characterizes Bartz's description of Graves as "victim Jazmine" as impermissible opinion evidence. However, Major did not brief whether Bartz's testimony met the Washington test for opinion evidence. *See State v. Demery*, 144 Wn.2d 753, 759, 30 P.3d 1278 (2001). Rather, Major conclusively identifies Bartz's statement as impermissible opinion evidence of a defendant's guilt without citing to any authority.

RAP 10.3(a)(6) directs each party to supply in its brief, "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." We do "not consider conclusory arguments unsupported by citation to authority." *State v. Mason*, 170 Wn. App. 375, 384, 285 P.3d 154 (2012). "'[P]assing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.'" *Mason*, 170 Wn. App. at 384 (quoting *West v. Thurston County*, 168 Wn. App. 162, 187, 275 P.3d 1200 (2012)).

Because Major has not cited to any authority or provided any substantive argument that Bartz's testimony constituted improper opinion evidence, we do not consider the issue further.

II.      MAJOR'S SENTENCE

Major argues that the trial court lacked authority to condition his suspended sentence on the gross misdemeanors on his completion of 12 months of community custody. He bases this argument on *State v. Gailus*, where the court concluded that the "imposition of probation is not authorized when the maximum jail sentence is imposed on the offender." 136 Wn. App. 191, 201, 147 P.3d 1300 (2006) *overruled on other grounds by State v. Sutherby*, 165 Wn.2d 870, 204 P.3d 916 (2009),

The applicability of *Gailus* to this case depends on our de novo interpretation of the trial court's sentence. Because we cannot discern what the court intended, we remand for clarification and resentencing.

A.      STANDARD OF REVIEW

Whether a sentencing court imposed an unauthorized sentence is a question of law we review de novo. *State v. Murray*, 118 Wn. App. 518, 521, 77 P.3d 1188 (2003). We review alleged sentencing errors based on the principles that (1) a sentence in excess of statutory authority is subject to collateral attack and (2) a defendant cannot agree to punishment in excess of statutory

authority. *In re Pers. Restraint of Goodwin*, 146 Wn.2d 861, 873-74, 50 P.3d 618 (2002). Illegal or erroneous sentences may be challenged for the first time on appeal. *State v. Ford*, 137 Wn.2d 472, 477, 973 P.2d 452 (1999) *superseded by statute on other grounds*, LAWS OF 2008, ch. 231, § 4, *as recognized in State v. Cobos*, 182 Wn.2d 12, 15-16, 338 P.3d 283 (2014).

      B.      APPLICABILITY OF *GAILUS*

In *Gailus*, the trial court sentenced the defendant to a total of 12 months for his ten felony convictions, and a maximum one year for each of his two gross misdemeanor convictions. 136 Wn. App. at 200. The trial court ordered "that the gross misdemeanor sentences run consecutively to each other and consecutively to his felony convictions." *Gailus*, 136 Wn. App. at 200. It then suspended the two 12 month gross misdemeanor sentences on the condition that the defendant serve 24 months in custody and complete 48 months of probation. *Gailus*, 136 Wn. App. at 201.

The sentence was vacated because the suspension of two consecutive 12 month sentences conditioned upon 24 months in custody "did not actually suspend any jail time." *Gailus*, 136 Wn. App. at 201. Because the court's authority to impose probation was conditioned on suspended time, the court vacated the defendant's probation. *Gailus*, 136 Wn. App. at 201. Thus, *Gailus* held that a sentencing court that orders a defendant to serve the maximum sentence for his conviction does not suspend any jail time. 136 Wn. App. at 201. It also held that a sentencing court cannot order probation if it does not suspend any jail time. *Gailus*, 136 Wn. App. at 201.

In the current case, the trial court sentenced Major to 19 months custody on his felony count, and 364 days custody on each misdemeanor count. Neither the transcript of the sentencing

hearing nor the judgment and sentence form make entirely clear whether the judge intended for the misdemeanor sentences to run concurrently to the felony sentence, or only concurrent to one another.[4]  The form used by the trial court stated that the sentences on counts four through seven were suspended for 24 months, but also stated that "[a]ll counts shall be served concurrently."  CP at 30.  The judge also sentenced Major to 12 months of community custody on each count.[5]

If the time on Major's misdemeanor sentences was to run concurrently with his felony sentence, this case presents the same situation as *Gailus*.  The trial court would have ordered the defendant to serve the full time it was suspending, thus leaving no suspended time.  However, it seems more likely that the court intended the gross misdemeanor sentences to run concurrently to one another, but not concurrent with the felony sentence, despite the preprinted language on the modified judgment and sentencing form.

Because the sentencing court's sentence is unclear, we remand for resentencing.[6]

---

[4] The trial judge used a modified version of the "Felony Judgment and Sentence – Prison" form that contained a section providing for "Non-Felony Counts."  CP at 24, 30.  The form does not make clear whether the suspended misdemeanor sentences were intended to run concurrently with the 19 month felony sentence.

[5] Although neither party has raised the issue, the trial court erred by sentencing Major to community custody on the misdemeanor counts because community custody applies only to felonies.  *See* RCW 9.94A.505 (permitting community custody sentence "[w]hen a person is convicted of a felony" as part of the Sentencing Reform Act); *State v. Snedden*, 149 Wn.2d 914, 922, 73 P.3d 995 (2003) ("[T]he [Sentencing Reform Act] . . . only applies to felonies.").

[6] Major also assigns error to the trial court's suspension of his misdemeanor sentences.  Because we are remanding the case for resentencing, we do not address this argument.

We affirm Major's convictions and remand for resentencing.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Melnick, J.

We concur:

Johanson, P.J.

Lee, J.